ELLA BROUGHTON WOODS *et al. v.* ISABELLA B. ROBERTS,

and

SAME *v.* SAME.

*Opinion filed April 17, 1900—Rehearing denied June 7, 1900.*

1. FIDUCIARY RELATIONS—*one occupying fiduciary relation must act with utmost fairness.* A step-mother stands in a fiduciary relation to her step-children, and, as executrix of their father's will, is bound to deal with them and their interests with the utmost fairness, and is incapacitated from dealing with them to her own advantage.

2. SAME—*burden of proof in transaction between parties in fiduciary relation.* Where a step-mother who is executrix of her husband's will purchases the interests of her step-children in the real estate, and in part settlement, by agreement, deducts from the purchase price the amount of certain notes held by her against the testator, the burden of proof is upon her to show that she paid full value for the interests of such step-children and that the estate was indebted to her on account of such notes.

*Roberts* v. *Woods*, 82 Ill. App. 630, reversed in part.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of DeKalb county; and writ of error to the Circuit Court of DeKalb county; the Hon. GEORGE W. BROWN, Judge, presiding.

CARNES & DUNTON, and A. G. KENNEDY, for appellants and plaintiffs in error. .

JONES & ROGERS, and CHARLES WHEATON, for appellees and defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

Ella Broughton Woods, May Broughton and Ben Broughton, appellants in the appeal from the Appellate Court and plaintiffs in error in the writ of error from this court to the DeKalb circuit court,—which appeal and writ of error are here taken and considered together on the same record, abstracts and briefs,—brought their bill in equity in said circuit court against Isabella B. Roberts, (formerly Broughton,) John D. Roberts, her husband, and other defendants, to set aside a certain alleged arbitration and a sale and conveyance of real estate, and to compel said Isabella to account for moneys which she had received upon certain certificates of deposit, and for other relief.

The facts are too voluminous to be recited here *in extenso*, but a sufficient understanding of the case may be obtained from the following:

The said Isabella B. Broughton (now Roberts) was the third wife of Chauncey W. Broughton, who died testate May 8, 1893. There were born of said marriage two of the defendants to the bill, Charles B. Broughton and Chauncey W. Broughton, Jr., who were minors at their father's death, and for whom, by his will, their mother, the said Isabella, was appointed testamentary guardian. The said Ella, May and Ben Broughton, complainants in

the bill, were the issue of their father's second marriage, their mother having died when they were infants of tender years. Preston Broughton, also a defendant, was the oldest child of the testator and the only issue of his first marriage. These six were all of the children and heirs of the testator. The testator, at the time of his death and for many years before, resided on his farm of upwards of 832 acres, in DeKalb county. In addition to this land he owned considerable personal property, consisting principally of interest bearing notes, given for money loaned, somewhat in excess of $85,000, and, as claimed by the complainants, of upwards of $30,000 in banks, evidenced by certain certificates of deposit. There were also household goods and effects and certain chattel property upon the farm. The will, which is not in controversy, was made February 14, 1893,—less than three months before his death,—and gave Preston, his oldest son, $1000, and gave the rest of his property, lands, farming implements, stock, grain, household goods, all moneys, credits and personal property of every kind, to his wife, Isabella, and to his five children, Ella, May, Ben, Charles and Chauncey, equally,—excluding Preston. The will directed that the land should remain undivided, as a home for his widow and said five children; that there should be no appraisement of his personal estate, and that his widow and his son Ben should be executrix and executor of his will. The will was probated and the appointees qualified, but the widow took upon herself, exclusively, the control and management of the estate. She divided the $85,000 in notes among the legatees soon after said testator's death. The complainants received their respective shares of them, and as to such notes there is no controversy. But the complainants, by their bill, demand that she be compelled to account for the proceeds of the following securities collected by her after the testator's death, viz.: Two notes, one for $2000 and the other $160, executed by Ella D. Kelso, of Longamont, Colorado; four certificates

of deposit of the DeKalb National Bank, for $2000 each, dated March 27, 1893, payable to the testator's order, with interest at two per cent per annum if the money should be left on deposit three months; four certificates of the Waterman Bank, dated February 1, 1893,—one for $3000, one for $300 and two for $1000,—each payable in like manner to the testator's order; also eight certificates of the Barb City Bank at DeKalb, dated January 23, 1893, each for $2000, and six others of the same bank of different dates in March and April, 1893, and for different amounts, aggregating $3500, the last one being dated April 25, 1893, and for the amount of $400,—all of which fourteen certificates of said Barb City Bank, aggregating $19,500, were for moneys deposited by the testator or renewals of former certificates, and were payable to himself. There were also some notes of doubtful value which the said Isabella was to distribute when collected. An accounting was also sought of stock, grain and other personal property sold by the widow from the farm.

Said Isabella and her two children, Chauncey and Charles, and the three complainants, her step-children, continued to reside together on the farm, in accordance with the expressed wish of the testator, from his death, May 8, 1893, until some time in the fall of 1894; but about August 1, 1894, said Isabella, for herself and as guardian for her said two children, and the three complainants on their own behalf, entered into a written agreement, whereby said Isabella was to purchase the complainants' interest in the farm at the price which should be fixed by J. D. Roberts and J. H. Lewis, arbitrators, whom they had appointed, and was to pay for complainants' interest by deducting from the purchase price one-half of certain promissory notes, and interest thereon, which she claimed to hold against the testator, payable to herself, and to pay the balance in cash. The amount of such notes was not stated in the agreement. In consideration of such purchase she was to waive her award of $1846

which had been set off to her by the appraisers. The value of the land was fixed by the two arbitrators at $45 per acre, and the notes held by her against the testator, on being produced by her, were found to amount, principal and interest, to. $17,700, which being deducted from the total, left upwards of $3000 due each of the complainants for their respective shares. She gave them her notes for these amounts and afterward paid them. One of the objects of the bill was to set aside this settlement, and the sale and conveyance of complainants' interest in the farm, on the ground of fraud and undue influence.

At the time of his death the testator was seventy-five years old, and he and the said Isabella had been married eighteen years. The bill alleged that the complainants during all that time lived with and formed a part of the family; that they were under the control of said Isabella, who took the place of mother to them, and that said Ben Broughton knew no other mother; that complainants were given but little education except what they obtained at the district school, but were kept at almost continuous labor, the said Ben upon the farm and the said Ella and May in household work; that by the acts and influence of said Isabella they were kept in ignorance of business affairs, and especially of the financial affairs of the family; that she was a woman of strong will and of extensive business knowledge, and by various expedients contrived to get possession of a large portion of their father's property; that she transacted much of his business and procured securities for moneys due him to be taken in her name; that for the last few years of his life he was infirm in body and nearly blind, and that during this period she transacted nearly all of his business, but kept all knowledge thereof, so far as possible, from complainants. Various acts of fraud and undue influence are alleged, which, so far as necessary to the decision of the case, will be stated in connection with the evidence bearing upon each. By an amendment

to the bill it was alleged by complainants that the said Isabella forged the name of their father upon the back of the certificates of deposit issued by the DeKalb National Bank and the Waterman Bank, and after his death wrongfully withdrew the money so deposited and converted it to her own use; that in each of the fourteen certificates of deposit issued by the Barb City Bank she caused the cashier, without the knowledge of their father, to interline after the words "payable to himself" the words "or Belle B. Broughton," and after his death withdrew said moneys from the bank and refused to account for the same; that she also forged their father's name to two paper writings purporting to be an assignment of said certificates from their father, and purporting to be witnessed by E. P. Orr and Henry H. Wann.

All allegations of forgery, fraud and undue influence were denied by the answer, and after a hearing in the circuit court on depositions and oral and documentary proof, a decree was entered which sustained the allegations of the bill as to the certificates of deposit of the DeKalb and Waterman banks, which, with interest to the time of the entering of the decree, amounted to $18,417.23, and ordered said Isabella to account also for $2819.68, the proceeds of the sale of chattel property on the farm, and also that she pay the costs. As to the item of $2819.68 all parties were satisfied, but from so much of the decree as required her to account for the $18,417.23, as proceeds of said ten certificates of the DeKalb and Waterman banks, and interest thereon, said Isabella appealed to the Appellate Court, in which court the complainants assigned cross-errors as to the findings of the decree which were against them. The Appellate Court reversed the decree and remanded the cause with directions, so far as it required said Isabella to account for the proceeds of said ten certificates,—that is, said item of $18,417.23,—and affirmed it in all other respects, holding, however, that the Appellate Court had no jurisdic-

tion of, and therefore it declined to consider, that part of the decree affecting the sale and conveyance of complainants' interest in the farm, because a freehold was involved, and declined also to consider the arbitration settlement involving the $17,700 of notes, that being a part of the same transaction. The complainants then sued out from this court a writ of error to the circuit court and appealed from the judgment of the Appellate Court, thus bringing before us all the questions involved except the finding as to the item of $2819.68, with which all are satisfied.

We shall consider first that part of the case involving the certificates of deposit, which, in the three banks, were twenty-four in number, and amounted, principal and interest, to more than $36,000.

The evidence shows that the testator was a man of strong mind and will, secretive about his business except with his said wife, who often aided him in his business affairs. He was mentally capable of transacting ordinary business when the alleged assignments were made and until a few days before his death. For the last year or more of his life his eye-sight was very defective, but he could see to write his name, and did sign with his own hand his will a few months before his death. He kept his valuable papers in a safe in his own house, to which his wife had access, and from which she would often, at his request, obtain and bring them to him. His wife also had a safe in the house in which she kept her valuable papers. Her familiarity with his papers and with his business affairs, and his defective eye-sight, afforded her ample opportunities for obtaining his signature by fraudulent means and for purposes of her own, but there is no sufficient evidence that she obtained the assignment of these certificates by fraud or by undue influence exerted over him. Indeed, as to the ten certificates of the DeKalb and Waterman banks the case as made by the complainants rests upon the charge in the amended bill that she

forged his name upon the back of each of said certificates, and much evidence was given tending to prove that the signatures in question, including those to the two separate written assignments, were not in his handwriting. Two expert witnesses of conceded ability, Marshall D. Ewell and Henry L. Tolman, testified in the most positive terms that in their opinion the signatures were not genuine; and other witnesses gave similar testimony. Many witnesses, however, who were acquainted with his handwriting, including bankers and business men with whom he had transacted business, testified that the signatures were in his handwriting. There were also given in evidence the said two assignments and a third paper, all witnessed by Orr and Wann, viz.:

"Carlton, *Feb. 9, 1893.*

"I, Chauncey W. Broughton, do this 9th day of February, 1893, give to my wife, Isabella B. Broughton, all my bank certificates of deposit as her own property.

C. W. Broughton.

Witnesses: E. P. Orr, H. H. Wann."

"Carlton, *April 17, 1893.*

"I this day give to my wife, Isabella B. Broughton, all my bank certificates deposited since February 9, 1893, as her own personal property, and I transfer them to her.

C. W. Broughton.

Witnesses: E. P. Orr, H. H. Wann."

"Carlton, *April 17, 1893.*

"Belle B. Broughton will pay to the following heirs: Isabella B. Broughton, Ella Broughton, May Broughton, Ben Broughton, Charles B. Broughton, Chauncey W. Broughton, on all notes that they select, by my order, and sign my name.

C. W. Broughton.

Witnesses: E. P. Orr, H. H. Wann."

The depositions of said Orr and Wann were also read. Each testified that both were present at each of the times when the assignments were executed, and that they saw Mr. Broughton sign the same, and saw him sign his name on the back of each of said certificates of the DeKalb and Waterman banks; that said Isabella wrote these instru-

ments above set out, except the signatures, at Mr. Brough-
ton's dictation, and that they signed them as witnesses at
his request, and that thereupon he delivered them to her
and told her they were her property. It was afterward
developed that these attesting witnesses were not at the
home of Mr. Broughton, where they said these papers
were made and signed, on the 9th day of February, when
the first one appears to be dated, but testimony was given
that they were there on the 11th of February and on the
17th day of April, and we cannot say that the mistake as
to the date might not have been honestly made. It was
not made to appear that these witnesses had any inter-
est in the matter, nor was their testimony in any way
impeached, although its strength was impaired somewhat
on cross-examination and by circumstances proved. We
cannot say that the allegation of forgery of these signa-
tures was sustained by a preponderance of the evidence,
and it is not, therefore, important to consider the question
raised in the argument, whether or not it was necessary to
prove the charge of forgery, as in criminal cases, beyond
all reasonable doubt. Orr and Wann testified also that
on one of these occasions Mr. Broughton spoke of the
certificates of the Barb City Bank, which were then also
produced and delivered to his wife, and that he said that
it was not necessary to sign them over to her as they
were already payable to her. These were the certifi-
cates in which the cashier had interlined after the words
"payable to himself" the words "or Bell B. Broughton."
The cashier of the bank and Mrs. Chanler, a sister of
Mrs. Broughton, testified that he interlined these words
in pursuance of a written request of Mr. Broughton which
Mrs. Chanler brought with the certificate to the bank.
Wann testified that the aggregate amount of all the cer-
tificates so delivered in his presence to Mrs. Broughton
was between $30,000 and $34,000. The certificates having
been delivered the title passed. But as to one certificate
of the Barb City Bank for $400, it was not issued until

April 25, 1893, and could not have been delivered at either of the times mentioned by Orr or Wann, and there is no evidence it was ever delivered at all, and as to it, it must be held that it is the property of the estate and should be accounted for accordingly.

While many circumstances were shown casting suspicion upon the good faith of Mrs. Broughton (now Roberts) and upon these transfers, we do not find in the record sufficient evidence upon which to set the assignments aside and to compel her to account for these deposits, except as to said $400 certificate, and we think the Appellate Court, with this exception, decided correctly as to this part of the decree.

It is urged, also, that Mrs. Roberts should account for the $2160, and interest thereon, received by her after Mr. Broughton's death in payment of the Kelso notes. It was shown, principally by said Isabella's own letters to Etta D. Kelso, the maker of these notes, given in evidence by the complainants, that the notes for this indebtedness were originally payable to said Chauncey W. Broughton, but that she had purchased them from him and had taken new notes from Mrs. Kelso in her own name. . The evidence relating to this transfer is meager, but it is clear from the evidence that said Isabella had moneys of her own when she married Broughton (how much the record does not show) and acquired more during her married life, and that she and Broughton often had business dealings with each other. She would lend him money when he needed it to make up some certain amount for a loan and would take his note for the amount, which he would afterwards pay. Other business transactions between them were shown. She bought eighty acres of land from him a short time before his death, for which she paid him $3500 and soon after his death sold it for upwards of $4000, and the complainants allege that by fraud and undue influence she obtained this eighty-acre tract at less than its value, and that she should account for the dif-

ference. But we find no sufficient evidence in the record of fraud and undue influence in respect to the purchase of either the Kelso notes or of the eighty acres of land. While it is clear from the evidence that she was a thrifty woman, even in her dealings with her husband, still, whatever may be said of other transactions mentioned in the record, there is not sufficient evidence to sustain the allegations of the bill relative to either the Kelso notes or the eighty acres of land. It may well have been that her husband was willing to have her make a good trade even with himself. It also appears that he was a man of sound mind and strong will and not easily influenced by any one.

But a very different aspect of the case is presented respecting Mrs. Roberts' dealings with the complainants. Over them her influence was paramount—that of the parent over the child. Not only such influence as may be presumed from that relation, but the evidence shows the fact was that they obeyed her without question, even after they had reached their majority, and that they never interposed their will or judgment against hers in matters relating to the estate or its distribution. She was the executrix of the will, and although the complainant Ben Broughton qualified to act with her, she took upon herself the control of the entire estate and its administration and received all of the assets, apparently without question by him or by the other complainants and doubtless with their full approbation. The evidence shows also that she frequently enjoined upon them the importance of keeping as a secret from "outsiders" all matters relating to the estate, and advised them not to consult others about their business affairs, and became angry with them when she suspected they had done so. Under these circumstances, and occupying such a position with respect to the complainants and the estate, she was bound to deal with them and with their interests with the utmost fairness to them. She was incapacitated

from dealing with them for her own advantage, and the relation appearing, the burden of proof was on her to show that, in acquiring any part of the estate which belonged to them, she conserved their interests and paid them full value. These principles of equity are too well understood to require elaboration or citation of authority, and the controversy over the arbitration settlement and the conveyances made by the complainants of their interest in the farm is one principally of fact. While we have read and considered all of the evidence, only the principal points established by it can be stated here.

It appears from the record that, notwithstanding the testator directed by his will that the farm should remain undivided as a home for the six devisees, there was, at the time the arbitration settlement was made, the mutual desire, as between Mrs. Broughton on the one side and the complainants on the other, to separate and to make some final adjustment of their property rights. About this time John D. Roberts, who resided with his family on his farm a few miles away, was an occasional visitor at the Broughton home, where he was sometimes consulted by Mrs. Broughton in her business affairs after her husband's death. The complainant Ben Broughton also consulted him about the best method of arriving at a settlement with Mrs. Broughton. Mrs. Broughton expressed a willingness to buy complainants' interests if the price should be satisfactory, but would not sell, inasmuch as the interests of her two minor children could not be disposed of by any agreement they could make. The result was the selection of Roberts by the complainants and of Lewis by Mrs. Broughton to fix the price which she should pay the complainants for the land. Lewis drew the agreement of arbitration, the contents of which we have stated. After the instrument was signed by the parties the price was fixed for the land by Roberts and Lewis at $45 per acre, and Mrs. Broughton then produced the notes, which were found to amount to $17,700,

and one-half of that amount was subtracted from the purchase price of complainants' lands. Neither of the arbitrators raised any question as to the justice of allowing these notes, although some of them were on their face barred by the statute, and both arbitrators knew that Mr. Broughton contracted but few debts,—that he was a man of abundant means and always paid promptly what he owed. None of the interested parties knew before what they amounted to. Mrs. Broughton testified that she did not know—that she had never counted them up. Ben, the youngest of the three complainants, and who seems to have acted for his sisters as well as for himself, had previously said to Mrs. Broughton that he supposed the notes would have to be allowed, but at that time she had told him, as he testified, that they would be about $10,000. Before that she had told Ella that they would amount to $5000 or $6000. It does not appear that the complainants objected at the time, or that they knew that they had any right to object, to anything the arbitrators did, and Mr. Lewis testified that he did not know that the settlement was unsatisfactory to any of the complainants until after the papers were all executed and he had stepped into the hall, where he found Ella Broughton in distress, when, in response to his inquiry as to her trouble, she said: "Mother hasn't done right; there's more of those notes than there ought to be," and further, in substance, that they were to have been canceled by the certificates. Lewis knew in advance from Mrs. Broughton that she expected him to get the land at as low a price as he could, but that she would pay at not to exceed the rate of $45 per acre, and we think the evidence tends to prove that she knew in advance that Roberts would agree with him upon that price. The preponderance of the evidence in the record is that the land was at that time reasonably worth $55 per acre. After this settlement, in August, Roberts became a more frequent visitor, and in October he obtained a divorce

from his wife and on the first of the following January married Mrs. Broughton, and thereafter resided with her on the Broughton farm and the complainants established themselves elsewhere.

While that part of the case relating to the chattel property on the farm is not now in controversy, Mrs. Roberts having acquiesced in the decree fixing the amount for which she should account, still the acts of herself and husband in dealing with it, and with the complainants' interest therein, clearly show they were willing to resort to deceit and unfair means to obtain advantage to themselves and against the complainants. One McGirr was procured by Roberts, at an expense of five dollars, to come to the farm at an appointed time, ostensibly to purchase the chattel property, which consisted largely of farm produce and some stock, for himself but really for Roberts. Ben endeavored to get McGirr to pay more than he offered, but Mrs. Roberts said he had offered enough and the property was accordingly sold to McGirr, who departed with his five dollars received from Roberts, and Roberts soon after sold the grain at a large profit. We cannot agree with counsel for the defendants that this transaction has nothing to do with the case because it is no longer in controversy. It was one of a series of acts, and throws light on others which preceded or followed. There was another transaction relating to the collection of a note called the McCleary note, which is hot in controversy, as Mrs. Roberts accounted for the proceeds, but it showed that she had the disposition to acquire for herself property belonging in part to the complainants and to conceal it from them.

While the burden was on Mrs. Roberts to prove that she paid full value for complainants' lands, the evidence, as before stated, shows she did not pay full value. The burden of proof was also on her to show that the estate was indebted to her on account of the notes which she claimed to hold against the testator, and in this she

wholly failed.  While the evidence does show that Mr. Broughton sometimes borrowed money of his wife temporarily, to make up certain amounts for loans he desired to make, it also shows he would again re-pay her, and she would bring him his note which he had given her and he would destroy it.  But none of these notes were connected with any particular transaction nor was the signature to any of them proved.  He was a man of large means and paid all of his obligations promptly.  Before his death it appears that it was his purpose to have all his business affairs so adjusted as to give no occasion for dispute among those who would succeed to his property and as would require as few proceedings in the courts as possible.  The evidence shows also that he expressed satisfaction that he had all of his affairs straightened up. While his will provided for funeral expenses, no mention in it was made of any debts.  Nor is there any evidence in the record outside of the notes themselves,—or, rather, the copies of them, for the originals were lost before the hearing below,—that Mr. Broughton knew that his wife held any of these notes against him, or that she ever spoke of any of them to him or to any of the family prior to his death.  There is evidence, however, that afterward, about the time of the division of the $85,000 of notes, she showed one of them to May and asked her if the signature looked like her father's; and at another, she said she had some notes but she did not intend to bring them up against the estate; at another, that she considered them paid by the certificates.  Ben Broughton testified that after the division of the $85,000 of notes she showed him one of a little bundle of notes and said his father had given them to her, whereupon he asked her what she intended to do with them, and she replied that she did not intend to do anything with them—would never pre-· sent them; that his father had given her a great deal and she never could present them; that she further said, "Just for the fun of it, add up the face value and see what

they amount to;" that he did so as she gave the amounts and they amounted to between $5000 and $6000. As a witness Mrs. Roberts denied that she ever mentioned the notes to any of the complainants until the day of the arbitration, except to Ben, when he agreed they should go in with the settlement, and stated that she had never computed them and did not know what they amounted to.

In compliance with the prayer of the bill the defendants set forth in their answer copies of all of these notes, they having been retained by Mrs. Broughton after they had been canceled by the arbitrators at the settlement. She and Roberts, her husband, produced them, with other papers, at the office of her attorneys, where the copies were made by their stenographer, and we think the evidence shows that she took them away from the office when the copies were finished. They were afterward lost in some way and were not produced when called for by complainants' solicitors in taking their proofs, nor upon the trial. Roberts testified that he had made diligent search among his papers at the bank where he had previously kept these notes for his wife but could not find them, and she testified that she had made similar search at their home and was equally unsuccessful. The disappearance of these notes from the hands of Mrs. Roberts at so important a period in the progress of the case was another circumstance proper to be considered, in connection with other evidence, upon the question of her good faith, and whether or not they constituted a *bona fide* indebtedness in her favor against the estate. The copies attached to the answer show no endorsement on any of the fifteen notes. Nearly all of them were payable on demand. The first two were for small amounts, dated in 1878, and drew ten per cent interest. The next two were dated in 1882,—one for $900 and the other for $2390,—and drew interest at eight per cent. The others, some in large and some in small amounts, bore dates, respectively, in each year from 1885 to 1893, the last one being for $970,

dated January 14, 1893, payable on demand, at six per cent. The daughter Ella testified that her father borrowed $70 of his wife in January before he died, to make up a certain amount for some purpose, and gave her his note for it, which witness read to him, and a few days afterwards he asked Mrs. Broughton to get the note, saying he would straighten it up; that she brought a note, which witness did not examine, and he tore his name off of it and destroyed it and then handed his wife some money across the table. This testimony was, however, denied by Mrs. Roberts, and the copies show no note dated in January, 1893, except the one for $970. She also denied the testimony of the complainants that she had told them that she kept copies of all her notes.

There are many facts and circumstances in the evidence which tend strongly to prove that Mrs. Roberts had no valid subsisting claim against the estate on account of these notes. During all the time that they appear to have been in existence Mr. Broughton had more than sufficient money to pay them on deposit in bank, drawing interest at a much less rate than the notes called for. The evidence shows that, even as between themselves, they transacted business in a strictly business way, and it is wholly inconsistent with Mr. Broughton's business methods shown by the evidence, and his evident desire to arrange for the settlement of his estate without litigation, that he would leave unpaid these old notes, amounting to so large a sum, in his wife's hands, and dispose of all of his property, giving his wife all of his moneys in bank, without saying anything about this indebtedness to her. He would have known that he could not leave a more fruitful source of discord and litigation to his family than that. Less than three months before he died, but when he was fully competent to transact business, he conveyed by deed to his wife eighty acres of land, for which she paid him $3500 in cash. It is hardly probable that she would have paid him this large sum if

he had owed her moneys long past due in more than four times the amount, nor that after his death she would have withheld the notes from the adjustment in the division of the other notes and personal property and left only the real estate out of which they could be satisfied. She did not file her claim in the probate court, but as the two years for presentation of claims had not elapsed when the arbitration settlement was made she could still have done so had that settlement not been made. Her influence over Ben, the youngest of the three complainants and who had never known any other mother, was very great, and it seems to have been her purpose to obtain through him the amount of these notes rather than to produce them in court. At all events, from the whole of the evidence we are satisfied that she had no valid claim against the estate on account of said notes, and that all indebtedness of the testator to her on account of them, or any of them, had been satisfied by him and discharged in his lifetime, and that in bringing them forward and obtaining credit for them in the purchase of complainants' interest in the farm she was guilty of fraud,—and that, too, upon those whose rights in the premises it was her duty to protect.

Mrs. Roberts' counsel say that the bill impeaching this settlement was not filed until after the two years for filing her claim in the probate court had passed, and that to sustain the bill now will deprive her of all remedy on the notes. The question has been as fully litigated and considered in this case as it could have been in the probate court, and if she has no claim against the estate, —and we so hold,—she has lost nothing by having the question finally determined here.

It is also insisted that by the arbitration agreement Mrs. Roberts waived her award set off by the appraisers, and that that will be lost to her if the settlement should be set aside. Such a result to the wrongdoer should in nowise deter a court of equity from setting aside a fraud-

ulent transaction. Complainants have offered and will be required to refund what she paid them for their lands, and she must abide whatever loss she may have brought upon herself by her own wrongdoing. (*Ames* v. *Witbeck*, 179 Ill. 458.) But the question whether or not her award will be lost to her by the setting aside of the arbitration agreement, settlement and deeds is not presented here for decision.

The judgment of the Appellate Court will be in all respects affirmed except as to the $400 certificate of the Barb City Bank dated April 25, 1893, but in affirming the decree as to said certificate the Appellate Court was in error, and the judgment to that extent, and that part of the decree below, are reversed. Upon the writ of error the decree of the circuit court in denying relief and dismissing the bill in respect to the arbitration agreement and settlement and in respect to the sale and conveyance to Isabella B. Roberts by the complainants of their respective interests in the lands devised to them by their father is reversed, and both branches of the cause, considered as one case, will be remanded to the circuit court, with directions to enter a decree setting aside said arbitration agreement and settlement and the sale and conveyances of said land so made by the several complainants, upon the condition that they refund to said Isabella B. Roberts the respective amounts received by them from her for the conveyance of said lands, and finding that said notes so presented by said Isabella and included in said arbitration settlement had been paid, and constituted, and do now constitute, no debt or claim in her favor against the estate or against the complainants, and finding for the complainants as to said $400 certificate, and that she, Isabella B. Roberts, account and pay the costs in the circuit court and also in this court.

*Reversed in part and remanded.*