## Edward Mayrand et al. v. Marie Mayrand.

1. Administration of Estates—*Fairness Required of Persons in Fiduciary Relations.*—The court holds that under the circumstances of this case a fiduciary relation existed between the executors of the deceased, who were his sons by a former marriage, which would not permit them to take an advantage of their step-mother, but required of them the utmost fairness and frankness toward her, especially where she was an old woman but slightly acquainted with the language in which law papers are drawn and unacquainted with her legal rights.

Administration of Estates.—Proceedings in probate. Appeal from the Circuit Court of Kankakee County: the Hon. John Small, Judge, presiding. Heard in this court at the April term, 1901. Affirmed. Opinion filed July 12, 1901.

C. H. Payson and W. H. Savary, attorneys for appellants.

H. K. Wheeler and Alexis L. Granger, attorneys for appellee.

Mr. Presiding Justice Dibell delivered the opinion of the court.

The appraisers in the estate of Edward Mayrand, deceased, valued the specific articles allowed the widow by statute at a total of $1,448.50. The executors filed objections to this part of their appraisement. On a hearing in the County Court these objections were overruled, and the appraisement was approved and ordered entered of record, and the executors appealed to the Circuit Court from that order. A hearing was there had on the objections and a like order was entered. The executors prosecute this further appeal. The real and personal estate left was inventoried at about $45,000 and it is not now claimed the widow's award was excessive. The only defense argued here is that the widow had waived an award. She did execute an instrument containing such a waiver, and the sole question here is whether it is binding upon her.

Edward Mayrand and Marie Mayrand were married about

twenty-two years before the death of the former. Each had been previously married. Edward Mayrand had five children by his first wife, and Marie Maynard had seven children by her first husband. By this second marriage they had one child, Lillie, now Mrs. Franklin. Edward Mayrand died at his home in Kankakee on April 15, 1900, leaving a last will, in which he appointed Edward and Arthur, his only sons, his executors. By the will he gave his wife $1,000, and directed that it be paid her in cash immediately after his death. He also gave her a life annuity of $500 payable in two equal semi-annual installments, and required Arthur to pay it, and made it a charge on real estate devised to him. He also gave her the household furniture absolutely, and the use of the home for life, requiring his children by his first wife to pay the taxes upon it and keep it in repair during her life, and to rebuild it if destroyed by fire. He made a slight provision for Mrs. Franklin and her children, partly conditioned upon the acceptance of the will by her mother. He gave certain specific bequests and legacies to his children by his first wife, and the residue to them equally.

Mrs. Mayrand was a French woman, and testified through an interpreter, though she could both speak and read English slightly. At the time of Mayrand's death she was nearly sixty years old. For a week after the funeral she was ill and confined to the house. On April 19th, the day after the funeral, her step-son Edward, one of the executors, came to the house. According to his testimony he read the will to her, and asked her whether she was going to accept under the will, or wanted to take her dower under the statute. She replied that the provisions of the will were satisfactory to her. He then said it would expedite matters if she would sign an acceptance of the will. She consented, and said she would like to see the estate settled as soon as she could and get what was coming to her. He detailed both that and a later conversation quite fully without mentioning a widow's award, but upon that subject being specially called to his attention by his counsel he further testified that he told her

she was entitled to a widow's award in the estate, and he wanted her to relinquish that too, if they were going to pay her her money, and she replied that she would if they would give her the $1,000, and get Arthur to pay her first annuity. Mrs. Mayrand testifies as to this first interview that she did not ask for her money, but it was Edward who proposed to pay it to her, and that the subject of a widow's award was not mentioned. Edward then deposited the will with the county clerk, and went to his home in Watseka. On April 23d he returned to Kankakee, and went to his step-mother and asked her if she had changed her mind and she said she had not. He then went to W. H. Savary, an attorney, and engaged him to prepare the papers and he prepared the release in question, in evidence as Exhibit B. On April 24, Edward and Savary and his partner, Ruel, a notary public but not an attorney, went to the house and procured Mrs. Mayrand's signature to Exhibit B, and its acknowledgment by her before Ruel. The men testify that the paper was read by Savary to Mrs. Mayrand in English and explained in French, and that Savary told her that by signing the paper she was relinquishing her widow's award. Mrs. Mayrand and her daughter Mrs. Franklin, who was present, testify a widow's award was not mentioned. Mrs. Mayrand testified she did not then know what a widow's award was, and that it was not explained to her, and that she understood that by signing the paper she was accepting the will, and did not know the paper had any other effect or purpose.

The body of the instrument Mrs. Mayrand signed that day is as follows:

" For and in consideration of the liberal and satisfactory provisions made in my behalf in said last will and testament of my deceased husband, Edward Mayrand, aforesaid, filed in the County Court of said county on the 19th day of April, 1900, the probate of which is set for May 21, 1900, I, the undersigned, Marie Mayrand, widow of said Edward Mayrand, deceased, do hereby knowingly, willingly, irrevocably, and without any restraint whatever, accept all and singular the aforesaid provisions of said last will and testament made in my behalf as aforesaid; and I likewise renounce to, waive and relinquish my rights to a widow's

award under the laws of said State of Illinois, in and against the estate of said Edward Mayrand, deceased."

After this was signed the men went away. The next day, April 25th, the two executors came to the house. They showed their step-mother several notes for $1,000 each, and she selected one secured by a mortgage, and they assigned it to her as executors without recourse. The executors testify this note did not belong to the estate, but to Arthur, individually, though payable to his father. They then produced a lengthy paper previously prepared, which she signed. It was a receipt for the thousand dollar legacy, bound her to save the executors harmless, and among other things, recited that " she had accepted all and singular the provisions made in her behalf in said will, and waived her rights to a widow's award." Arthur then paid his step-mother $250, the first installment of her annuity, and produced and procured her to sign another carefully prepared document. It is not claimed the widow's award was mentioned at that interview on the 25th. The proof as to these papers is only that Edward told Mrs. Mayrand that these were the receipts for the money.

It is by no means clear that it was for the advantage of Mrs. Mayrand to accept the provisions of the will. The whole tenor of the will (including provisions we have not stated), shows the testator feared she might not. It is evident the sons, the executors, were anxious she should accept the will as soon as possible. Edward broached the matter to her the day after the funeral. He also came from Watseka on the 23d and stayed till the 25th, to secure the execution of these papers and the acceptance of the will by the widow, when so far as appears there was no other occasion for him to come till May 21st, the date set for the probate of the will. Arthur was willing to pay the legacy with a note of his own, if she preferred it, in order to close the transaction. No reason appears why he should pay this legacy with his own property, unless it was to get the will accepted by the widow while she was in the mood to do it. The claim that she was in haste for her money is not only

denied by Mrs. Mayrand, but is contradicted by the fact that she chose a note on time rather than the cash to which she was entitled by the will.   Up to the day after the funeral when Edward talked first with his step-mother about accepting the will, he and his wife had been staying in the house three or four weeks, in attendance upon his father. It is fair to presume Edward knew his step-mother was ill, and unable to be out of the house from the time of the funeral till she signed Exhibit B.   He took care to consult an attorney, and to have papers carefully prepared, and so executed in form as to bind her, if possible, and to have three witnesses present.   Neither he nor Savary advised her that she ought to consult an attorney and learn her legal rights and take legal advice before acting in so important a matter.   The attorney Edward called in (and whom he testifies Mrs. Mayrand suggested), was a friend of the family, had drawn the last will, and also a former will for deceased, had frequently been at the house in consultation with deceased about said wills, and had on those occasions met Mrs. Mayrand.   She would naturally trust and rely upon an attorney whom her husband had trusted.   The papers were in English, and in technical legal phraseology. Mrs. Mayrand read and spoke English but slightly.   She was nearly sixty years old, and was ill.   She was unacquainted with business transactions.   The executors were her step-sons, with whom the testimony is her relations had always been harmonious.   She testifies that she did not know the extent of her husband's property, and there is nothing to contradict that statement.   The executors and their attorney admit they knew its amount in a general way.   They did not tell her what they knew or give her any information on the subject.   Savary admits he knew her widow's award would amount to a sum ranging from $500 to $2,000, but he did not tell her so.   Edward admits that he knew he would get one-fifth of what was saved by a release of the widow's award.   The claim now made, that the executors were dealing with Mrs. Maynard at arm's length, as one stranger with another, is not tenable.   We

are satisfied that under all the circumstances a fiduciary relation existed, which would not permit these executors to obtain an advantage over their step-mother, but required of them the utmost fairness and frankness toward her. The principles which governed these parties in their relations and dealings with each other, are stated and illustrated in Woods v. Roberts, 185 Ill. 489; Thomas v. Whitney, 186 Ill. 225; and Marshall v. Coleman, 187 Ill. 556.

If Mrs. Mayrand and Mrs. Franklin have correctly narrated what occurred when Exhibit B was signed, a widow's award was not mentioned. If the testimony of Edward, Savary and Ruel be accepted as correct, the widow's award was mentioned, but it was not fully explained nor her legal rights made known to her. They testify she was told then, as Edward says he told her at a prior interview, that she was entitled to a widow's award, which she would relinquish by signing the paper. Savary testified that he further told her that a widow's award was a list of specified articles given by the statute to the widow, an estimate or value being fixed to those specific articles by three appraisers appointed by the court, and she then said she knew what a widow's award was, and he refrained from further explanation. They did not tell her she could accept the will and all its provisions, and still receive a widow's award. They did not tell her that in lieu of the specific articles, she would be entitled to their appraised value in money, without affecting her right to everything given her by the will. The proof will be searched in vain for any information from the executors or their attorney to Mrs. Mayrand that it would be a financial benefit to her to retain her widow's award, and a financial loss to her to relinquish it. As the will, which had been read to her, gave her " all furniture and chattels used by us in our home for housekeeping purposes and comfort at the time of my death," except testator's watch and iron safe, she might easily suppose from Savary's explanation that she would get the same articles by the will as by the award.

The executors claim Mrs. Mayrand must have understood

Mayrand v. Mayrand.

her rights because, as they proved by files of the County Court, she received a widow's award of $1,935 from the estate of her former husband, of which she elected to take specific articles amounting to $800.75, and the balance in cash.   But under the proofs this is not conclusive of her knowledge of the meaning of a widow's award.   This was in 1875, twenty-five years before the transaction here in question.   She was then left with a family of seven children, the oldest fourteen years and the youngest five weeks old.   She did not attend to the settlement of these matters, but it was done for her by a French friend.   She testified she knew she received an allowance from that estate, but understood it was for the support of her children.   It does not appear her first husband left a will, nor that she had any reason to know from the settlement of that estate that she could accept the will and still be entitled to a widow's award.

This was an old woman, but slightly acquainted with the language in which the papers were drawn, unacquainted with business, and so far as the executors knew, unacquainted with her legal rights.   Immediately after her husband's funeral, at a period of physical prostration, when she had no legal advice, she was approached by her stepsons, with whom she had always been on friendly relations and in whom she had a right to confide, and by their legal adviser, for an immediate surrender of important vested financial interest in her husband's estate.   We do not think she received such advice and such a statement of her legal rights as she was entitled to depend upon receiving from that source.   But further, she testified that at that interview when she signed Exhibit B, they told her that before she could have the money coming to her under the will she would have to sign these papers.   None of them contradict this.   That being so, if the widow's award was explained to her to the extent Savary testifies, she was also given to understand she could not take under the will and also receive a widow's award.   This was not true, and is of itself sufficient to warrant the action of the lower courts.

The trial judges in each of the lower courts saw all of the witnesses, and could better tell where the truth lay than we can by merely reading the testimony. We do not feel warranted in disturbing their conclusion. The order is therefore affirmed.